BROWN, Chief Judge.
Iiln this lawsuit, plaintiff, Annette Brown, asserted claims of false arrest, false imprisonment, and malicious prosecu *794 tion against the City of Monroe, Louisiana, and the Sheriff of Ouachita Parish. The Sheriff was dismissed on the grant of a motion for summary judgment.[1] A bench trial proceeded against the City. The trial court found that plaintiff was “arrested, booked and jailed for an offense she undoubtedly did not commit.” The trial court, however, found that the actions that were taken (by the police) were reasonable and appropriate. For the reasons expressed, we reverse and render judgment in favor of plaintiff.

Facts

On September 30, 2009, Monroe Police Officer Darren Canales responded to a complaint. His report played a material part in the ensuing drama and reads as follows:
On 9/30/09 at 0118 hrs. I, Cpl. Canales, was dispatched to the Library Lounge in ref to a stabbing. Upon arrival, I spoke with Lamar Carroll who advised just before log time he was walking west on DeSiard in approx. 5400-5600 blk when he was attacked by (2) black males wearing dark clothing. Carroll advised the attack was unprovoked and one of the men stabbed him in the left arm and stomach ... At 0256 hrs, I was dispatched to the LSU Medical Center in ref to Carroll changing his story. I spoke with James Cerda (LSU Police) who advised after the OPSO left the hospital Carroll advised he was stabbed by his girlfriend at 5330 DeSiard near the office in an altercation with his girlfriend, Annette Brown. I met OPSO at 5220 Highland apt 15 and contacted Carroll ... Carroll advised he had an argument with Brown because she discovered he lives with another female on Highland Dr. and Carroll advised Brown chased him with a knife from the apt. (on DeSiard) to near the office area where she cut him ... OPSO issued Carroll a summons for filing a false report and I attempted to locate Brown at 5330 DeSiard apt. 42 and did not locate her.
12Significantly, Carroll’s girlfriend’s name was Annette “Bryant,” who resided with Carroll at the Colonial Manor Apartments at 5330 DeSiard Street. Annette “Bryant” was born on March 4, 1970. The affidavit of the apartment complex manager, Vicki Smith, was admitted into evidence and stated that she had managed the apartment complex since 1999 and was familiar with all the tenants. She stated that Annette “Bryant” was listed as the tenant of Apartment 41 (not #42), and that the electric meter for that unit was registered under Carroll’s name. She stated that she did not know Annette Brown. Further, she had never been contacted by any law enforcement officer concerning Annette Bryant or Annette Brown or about the stabbing.
Officer Canales filed his report on September 30, 2009. The case was assigned to Detective Jeffery Dowdy whose report states the following:
On 10/2/09, at 0900 hours, I, Detective J. Dowdy reviewed this case. It appears the elements for the crime of aggravated battery have been met. This case will be reclassified to that crime. I attempted to contact both the victim, Lamar Carroll and suspect, Annette (Hubbard) Brown, but was unsuccessful.
Det. Dowdy’s report identified the suspect as Annette “Brown” born on February 17, 1966, and residing at 5330 DeSiard Street, Apt. 42. The name and birth date *795 are that of the plaintiff but it is now clear that plaintiff never resided at the address given by Det. Dowdy. Further, Det. Dowdy was unable to explain how he got the middle name “Hubbard.” Ms. Brown is listed in the data bank as Annette Denean Brown.
On October 2, 2009, after reviewing Officer Canales’ report, Det. Dowdy conducted an identification search on the Think-Stream computer database. His search produced a list of 18 black females named “Annette IsBrown” who resided in the state of Louisiana. Plaintiff was the only one of the 18 women who resided in Ouachita Parish. According to Det. Dowdy, he either called or went to apartment 42 at the DeSiard address and no one was home. He did not go to the Highland Drive address where Officer Canales reported the victim resided. The same day, October 2, 2009, Det. Dowdy sent the case to the district attorney.
In November 2009, the district attorney’s office filed charges against plaintiff, “Annette Brown,” then subsequently procured an arrest warrant. Ouachita Parish Sheriff Office (“OPSO”) record clerk Deputy Lia Fontana testified that the warrant she received had the name, race, date of birth and the DeSiard address. Deputy Fontana checked the OPSO’s record and found one record involving Annette Brown. Everything matched except the address which was 2612 Deloach Circle. Deputy Fontana inputted the 5380 DeSiard address. She stated that Annette Brown was never associated in the law enforcement database with the 5330 DeSiard Street address until Deputy Fontana entered it into the OPSO database when logging in the arrest warrant information in January 2010.
Detective Dowdy, however, testified that Annette Brown was connected to DeSiard address via the ThinkStream search he performed on October 2, 2009. He sent the file to the D.A. for an arrest warrant because the name, gender, race and the address matched. He did not make a copy of what he pulled up from the database.
The trial court had Detective Dowdy repeat his search at the time of trial in 2013. That search showed 222 Vernon, which was plaintiffs grandmother’s address; 103 Cedar Creek, which was plaintiffs mother’s Laddress; 2612 Deloach; and finally, 5330 DeSiard. The source for these addresses was the OPSO. The trial court concluded that:
... what Dowdy probably did was ... he found Annette Brown in Ouachita Parish, the one, and he just sent the address over ... to the DA’s office.... Somehow — and he may not even remember because this was a number of years ago but when he goes back and looks years later now she’s linked up with the 5330 DeSiard Street. The most logical explanation for that — if she wasn’t linked for — with it back in 2009 was that it’s a circular thing. He sent the warrant over there, she was arrested on the warrant, she [was] entered in some database, they update[d] it ...” (Officer Dowdy’s) testimony seems credible ... I think there’s a possibility he could be mistaken in what he remembers ... memory can play tricks on you.
On January 25, 2010, Annette Brown was at work at The Oaks Nursing Home in West Monroe when Dep. David Germany of the OPSO came in with a warrant for her arrest. The arrest warrant named Annette Brown, 5330 DeSiard #42, and the charge was aggravated battery. Ms. Brown protested to Dep. Germany that he had the wrong person; she showed him her driver’s license, which listed her address on Deloach Circle, in the Bernstein Park area and nowhere near DeSiard Street, and insisted that she knew nothing *796 about any aggravated battery. Dep. Germany took her into custody and brought her to Ouachita Correctional Center. There, she again tried to convince booking officers that she had nothing to do with the crime. After spending approximately one hour in jail, Ms. Brown was released on bail after paying a bail bondsman $1,255 to cover her $10,000 bond.
After her release, she went to the Monroe Police Department, looked at the offense report and saw that she was charged with battering her alleged boyfriend, Lamar Carroll, outside a lounge on DeSiard Street on September 30, 2009. She assembled her documents and went to the district attorney’s office. Ms. Brown was able to show that she has resided at 2612 Deloach | r,Circle since 2007 and was never associated with the DeSiard Street address or Carroll, the complainant. Ms. Brown produced her driver’s license and hospital records that showed she was released from E.A. Conway Hospital at approximately 4:00 p.m. on September 29, 2009, following an extended stay due to complications from gall bladder surgery. The stabbing occurred at approximately 1:00 a.m. on September 30, 2009. Within 48 hours of her arrest, the D.A.’s office confirmed Ms. Brown’s account, dismissed the charge, and cancelled the warrant.
Ms. Brown made numerous requests to city and parish officials for reimbursement of her $1,255 bond fee but was unsuccessful.
Discussion[2]

Liability

A claim for negligent infliction of genuine and serious emotional distress is a viable claim in Louisiana. See, Moresi v. State Dept. of Wildlife and Fisheries, 567 So.2d 1081 (La.1990); see also, Barrino v. East Baton Rouge Parish School Bd., 96-1824 (La.App.lst Cir.06/20/97), 697 So.2d 27. Recovery for mental anguish or emotional distress is based on La. C.C. art. 2315, which provides in part that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. | ^Courts use the duty-risk analysis to determine recovery under article 2315. Barrino, 697 So.2d at 33. For liability to attach under the duty-risk analysis, the plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm or damages, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Hardy v. Borne, 98-2821 (La.09/08/99), 744 So.2d 606.
Probable cause to arrest is an absolute defense to any claim against police officers for wrongful arrest, false imprisonment, or malicious prosecution. Harris v. Eckerd Corp., 35,135 (La.App.2d Cir.09/26/01), 796 So.2d 719. Police officers have probable cause to arrest an individual when the facts and circumstances within their knowledge and of which they have reasonably trustworthy information *797 are sufficient to warrant a prudent person in believing that the suspect had committed an offense. Id. Thus, probable cause has been described as a zone within which reasonable mistakes will be excused. Kelley v. Myler, 149 F.3d 641 (7th Cir.1998).
A duty exists for any law enforcement agency to correctly identify the suspect prior to his arrest and incarceration. Hayes v. Kelly, 625 So.2d 628 (La.App. 3rd Cir.1993), writs denied, 93-3026, 93-3048 (La.02/04/94), 633 So.2d 171, 580. In Hayes, supra, a police detective incorrectly identified the plaintiff as being the person named in an arrest warrant because he shared a similar nickname to that of the actual suspect. Plaintiff was subsequently charged and incarcerated. Plaintiffs original and subsequent arrest reports showed different addresses and different 17nicknames for the individuals sought. The court in Hayes held that the sheriff was negligent in his investigation. In the case sub judice, the MPD owed a duty to Ms. Brown to properly discern whether or not she was the correct suspect prior to transmitting a report to the district attorney’s office that would lead to an arrest warrant.
The dissenting opinion of Justice Stevens, joined by Justice Brennan and Justice Marshall, in Baker v. McCollan, 443 U.S. 137, 155-6, 99 S.Ct. 2689, 2700-1, 61 L.Ed.2d 433 (1979), is instructive:
Certainly, occasional mistakes may be made by conscientious police officers operating under the strictest procedures. But this is hardly such a case. Here, there were no identification procedures. And the problems of mistaken identification are not, in my judgment, so insubstantial that the absence of such procedures, and the deprivation of individual liberty which results from their absence, should be lightly dismissed as of no constitutional significance. The practice of making a radio check with a centralized data bank is now a routine policy, followed not only in every traffic stop in Potter County, but also in literally hundreds of thousands of cases per day nationwide. The risk of misidentification based on coincidental similarity of names, birthdays, and descriptions is unquestionably substantial; it is reflected not only in cases processed by this Court, but also in the emphasis placed on securing fingerprint identification by those responsible for the national computer system. The societal interests in apprehending the guilty as well as the interests in avoiding the incarceration of the innocent equally demand that the identification of arrested persons conform to standards designed to minimize the risk of error. I am not prepared or qualified to define the standards that should govern this aspect of the law enforcement profession’s work, but I have no hesitation in concluding that an 8-day imprisonment resulting from a total absence of any regular identification procedures in Potter County was a deprivation of liberty without the due process of law that the Constitution commands. (Footnotes omitted).
We also find the conclusion of the majority in Baker v. McCollan, 443 U.S. at 146, 99 S.Ct. at 2695-6, to be instructive:
Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles. Just as “[mjedical malpractice |Rdoes not become a constitutional violation merely because the victim is a prisoner,” Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), false imprisonment does not become a violation of the Fourteenth *798 Amendment merely because the defendant is a state official.
As did the trial court, we believe that Officer Dowdy is a conscientious police officer operating under the strictest procedures; however, his one-day cursory investigation fell short of reasonableness or probable cause. As a result, Officer Dowdy breached the duty of care owed to plaintiff, Annette Brown. If he had but put forth a reasonable effort to find the true identity of the suspect, the plaintiff would not have been arrested.
First of all, Officer Dowdy should have proceeded with greater caution given that the name “Annette Brown” was provided by a victim who had already falsely identified his attacker, an accusation that led to a misdemeanor charge of filing a false report. Secondly, once informed of the name Annette Brown, Det. Dowdy’s identification search on the ThinkStream computer database on October 2, 2009, failed to produce sufficient information to form the basis for probable cause to arrest. The evidence presented before this court shows that his search produced a list of 18 women named “Annette Brown” who resided in the state of Louisiana. Plaintiff was the only one of the 18 women who resided in Ouachita Parish. Apparently Det. Dowdy presumptively assumed that plaintiff was the suspect because she was from Monroe.
Additionally, based upon the testimony of Deputy Lia Fontana, Annette Brown was never associated in any law enforcement database with the 5330 DeSiard Street address until Deputy Fontana entered it into the |3OPSO database when logging in the arrest warrant information in January 2010. Prior to 2010, Annette Brown’s address was 2612 Deloach Circle, Monroe, La. 71202, and not associated with the 5330 DeSiard Street, Apartment 41 address. Det. Dowdy testified that Ms. Brown was connected to this address via the ThinkStream search performed on October 2, 2009; this court concurs with the lower court’s finding that his account of events was mistaken due to a lapse of time of more than three years.
This court finds that Det. Dowdy could have conducted additional measures to ensure a more accurate investigation. For instance, Officer Dowdy could have gone to the apartment complex where the incident took place and interviewed Vicki Smith, the Colonial Manor Apartment Manager. He would have easily discovered that no individual named Annette “Brown” resided in the complex. He would have also found that the inhabitant of 5330 DeSiard Street, Apartment 41 (not # 42), was named Annette “Bryant,” and that the utilities for that apartment unit were listed under Lamar Carroll’s name. Additionally, a cross check on Lamar Carroll on the OPSO’s computer database would have revealed the true identity of Carroll’s girlfriend as being Annette “Bryant,” not Annette “Brown.”
This court concurs with plaintiffs argument that because Det. Dowdy’s investigation was substandard, he failed to perform his duty to correctly identify the suspect prior to her arrest and incarceration and this was the cause-in-fact of the Ms. Brown’s wrongful arrest at her place of employment in the presence of her coworkers. The law imposes a duty on law enforcement officers to correctly identify a suspect prior to arresting and | ailing her specifically in instances such as these to prevent injuries of the exact nature that Ms. Brown suffered.

Quantum

Special damages must be specially pled or the amount of the damages must have the capability of being determined with relative certainty. Smith v. *799 Escalon, 48-129 (La.App.2d Cir.06/26/13), 117 So.3d 576. General damages involve mental or physical pain and suffering, inconvenience, loss of intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured exactly in monetary terms. Sallis v. Bossier City, 28,483 (La.App.2d Cir.09/25/96), 680 So.2d 1333, writs denied, 96-2592, 96-2599 (La.12/13/96), 692 So.2d 376, 1063; Nelson v. City of Shreveport, 40-494 (La.App.2d Cir.01/27/06), 921 So.2d 1111.
This court reverses the trial court’s decision to deny Ms. Brown damages. We find that Ms. Brown presented sufficient evidence to prove that she wrongfully incurred a $1,255 fee to compensate a bail bondsman and a loss of $145 in wages as a result of her inability to work for two days. Ms. Brown was a lady of modest means who worked two jobs. She had no criminal record but is now in the criminal database. She was arrested at her place of employment and had to meet and explain her arrest to her employer.
We agree with Ms. Brown that she should be awarded general damages in the amount of $20,000 as a result of the mental suffering she experienced from being arrested at work in front of her co-workers, booked and incarcerated in the city jail.

Conclusion

For the foregoing reasons:
InIT IS ORDERED, ADJUDGED, AND DECREED that there be judgment against the City of Monroe and in favor of plaintiff, Annette Brown, in the amount of $21,400. Cost as allowed by law are assessed to the City of Monroe.

. On appeal, a different panel of this court affirmed the grant of summary judgment in favor of the Sheriff. Brown v. City of Monroe, 47,396 (La.App.2d Cir.08/01/12), 103 So.3d 486.

. The issue of statutory immunity was not addressed by the trial court in its written reasons for judgment, nor was this issue raised by the City in its appellate brief. However, an appellate court may notice ex proprio motu that the law does not extend a remedy against a particular defendant. La. C.C.P. art. 927(B). This action is against the City of Monroe. La. R.S. 9:2798.1 grants immunity against tort claims to the state and its subdivisions for their policy-making or discretionary functions. Such immunity is not automatic just because the official had some discretion. Immunity extends only to those choices narrowly defined as policy-making or planning. Operational choices, such as the one made in the case sub judice, which involve the implementation of policy, are not immune. See Berkovitz v. U.S., 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).