BROWN, Chief Judge.
11 This tort action, which was filed on September 20, 2011, arises out of a three-vehicle accident that occurred on September 27, 2010, in DeSoto Parish, Louisiana. Prior to trial, defendants, the D.L. Peterson Trust Company, its insurer, National Union Fire Insurance of Pittsburgh, Adam Keys, and National Oil Well Vareo, stipulated to liability. Thus, the only issue to be decided by the jury was quantum.
At the time of the accident, plaintiff, McLawrence Fuller, was an active 70-year-old man with pre-existing, asymptomatic, degenerative disc disease and congenital spinal stenosis. Immediately following the accident, plaintiff complained of neck, lower back and radiating leg pain. Mr. Fuller opted for conservative treatment for several years, but, due to increasing levels of pain, he underwent a three-level lumbar fusion with instrumentation in June 2014. •
After a three-day trial, involving the testimony of six medical experts as well as that of plaintiff and several family members, the jury rendered its verdict awarding Mr. Fuller damages totaling $375,835.58. Plaintiff filed a JNOV, seeking an increase in his general damage award of $155,000 and an award for future medical expenses. JNOV was granted by the trial judge increasing Mr. Fuller’s general damage award to $1,200,000. It is from this judgment that both defendants and plaintiff have appealed. Defendants urge error in the trial court’s grant of JNOV to raise the general damages awarded by the jury, while plaintiff takes issue with the trial court’s failure to award him future medical expenses. For the reasons set forth below, we find that the *247 jury’s verdict was reasonably supported by ■the evidence ^presented in this case. The trial court erred in granting plaintiffs motion for JNOV on the issue of damages. Thus, we reverse the judgment granting JNOV and reinstate the jury’s verdict.

Testimony

Medical Testimony and Evidence

■ The medical testimony and evidence at trial established that, prior to the September 27, 2010, accident, Mr. Fuller had preexisting degenerative disc disease and congenital stenosis described by the physicians who testified at trial as an age-related arthritic condition superimposed on a congenital condition that caused plaintiff to be born with a narrowed spinal cord opening.
While these two conditions were not diagnosed before the accident, Mr. Fuller had made occasional complaints of lower back pain and leg weakness to his general practitioner, Dr. Thomas Bernard, who had been treating plaintiff since 2006 for various medical issues, including diabetes, high blood pressure and thyroid disease.[1]
Beginning on September 30, 2010, Mr. Fuller treated with a chiropractor, Michael Taylor. Plaintiffs complaints were neck, middle and | slower back pain. After . a comprehensive chiropractic exam, Dr. Taylor’s diagnosis was thoracic and lumbar strain/sprain. On his patient registration form, Mr. Fuller indicated that he had prior back complaints. The treatment plan Dr. Taylor designed for plaintiff in-eluded spinal manipulation; application of moist heat and/or ice, electrical muscle stimulation, intersegmental traction and instructions for at-home care. Dr. Taylor testified that he treated Mr. Fuller twice a week for several weeks post-accident, and he obtained improvement over the course of treatment. Mr. Fuller’s last appointment with Dr. Taylor was on December 2, 2010, although on that date plaintiff was still experiencing neck pain and .further treatment was scheduled.
At the same time that plaintiff was receiving chiropractic care, he was treating with orthopedic specialist, Dr. Austin Gleason. His diagnosis of Mr. Fuller was soft tissue injuries of the neck and back. Dr. Gleason treated plaintiff several times before releasing him from care on November 16, 2010.
Mr.. Fuller consulted orthopedic specialist, Dr. John Ferrell, on March 24, 2011. Plaintiff related that he had injured his neck, left shoulder and arm, and lower back in a motor vehicle accident in September 2010. In the medical history he provided to Dr. Ferrell, Mr. Fuller denied prior neck or back complaints or problems. Dr. Ferrell reviewed plaintiffs medical records, examined him and reviewed the results from cervical and lumbar tests before diagnosing him with an aggravation of a significant pre-existing degenerative disc disease and stenosis as a result of the accident. Dr. Ferrell |4also ordered nerve conduction studies for. Mr. Fuller, which *248 showed no nerve root impingement in connection with his leg complaints, and a bone scan, which was normal. Dr. Ferrell testified that trauma could have caused Mr. Fuller’s disc disease to become symptomatic or that it could have progressed on its own due to the normal aging process. He noted that plaintiffs symptoms were consistent with the accident as their cause. Although Mr. Fuller had pre-existing degenerative disc disease, because he had a “pretty significant injury,” Dr. Ferrell opined that it was the accident that made plaintiff symptomatic. Dr. Ferrell referred Mr. Fuller to his partner, Dr. Milan Mody, an orthopedic surgeon who specializes in the spine, for further treatment.
Mr. Fuller did physical therapy at Willis Knighton Health System beginning in May 2011; improvement of his symptoms was noted. His first appointment with Dr. Mody was on May 19, 2011. Plaintiff complained of neck and back pain, left arm pain and pain in both legs'. Dr. Mody did a cervical and lumbar spine exam. Mr. Fuller told Dr. Mody that the pain began after.his September 27, 2010, motor vehicle accident. Dr. Mody’s diagnosis was neck and back strain, as well as pre-exist-ing cervical degeneration and lumbar spinal stenosis. Non-invasive treatment as well as operative options were discussed. During a visit with Dr. Mody on August 4, 2011, Mr. Fuller reported that his neck pain had decreased so they focused on his lower back. Dr. Mody treated plaintiffs back complaints with a series of lumbar steroid injections performed by Dr. Randall Brewer, which, according to Dr. BreweFs testimony and records, provided Mr. | Duller with some temporary relief. Plaintiff was treated for low back pain and shoulder pain on September 28, 2011. Dr. Mody’s recommendation was still the conservative route since Mr. Fuller was obtaining relief with the injections. On February 9, 2012, Dr. Mody advised plaintiff that he had several options. He could repeat the physical therapy and/or injections since he had seen results with both, albeit temporary; undergo pain management which would include injections and narcotics; undergo a three-level laminecto-my (decompression) to alleviate his leg symptoms, or do nothing.[2]
When asked at trial whether the accident at issue could have caused Mr. Fuller’s degenerative disc disease and stenosis to become symptomatic, Dr. Mody’s answer was “yes.” As a result of Dr. Mody’s recommendation, that Mr. Fuller consider surgical intervention, defendants had plaintiff undergo an independent medical exam with orthopedic surgeon, Dr. Carl Goodman. On May 24, 2012, Dr. Goodman examined Mr.. Fuller. Prior to the appointment, Dr. Goodman reviewed plaintiffs medical records. Dr. Goodman noted that his partner, Dr. Gordon Mead, had previously treated plaintiff for fight hip and leg and low back pain in 2008. In the medical history reported to Dr. Goodman’s nurse, plaintiff denied any back problems prior to his September 2010 accident. Dr. Goodman noted that at the time he examined Mr. Fuller, almost two years post-accident, plaintiff related to him that he was not currently seeking treatment for his back or leg | ¿pain, but was taking Advil. Mr. Fuller, told him that his neck pain had resolved, and that at that time, he was willing- to try the treatment plan recommended' by Dr. Brewer, but not the surgery recommended by Dr. Mody.
*249 Dr. Goodman diagnosed Mr. Fuller'with a lumbar sprain and strain caused by the September 2010 accident which was superimposed on pre-existing degenerative disc disease and spinal stenosis at L2, L3 and L4. It was Dr. Goodman’s opinion that Mr. Fuller was at maximum medical improvement from the accident at issue, and he did not require any further medical treatment or prescriptions as he was managing well on Advil and did not want to have surgery at that time. On-cross-examination, Dr. Goodman noted that some patients choose to delay surgery’and live with the pain until it gets so bad they are ready to consider surgical intervention.
On July 18, 2013, Mr. Fuller made an appointment on his own (rather than at defense counsel’s request) to see Dr. Goodman. Plaintiff had consulted with a doctor in Dallas, who had done another MRI and recommended surgery. Mr. Fuller wanted Dr. Goodman’s opinion as to the Dallas doctor’s recommendation. After an examination, Dr. Goodman observed that neither plaintiffs complaints nor Dr. Goodman’s diagnosis had changed. Dr. Goodman told Mr. Fuller that if he was having symptoms that warranted surgery, such as increased pain, considering all factors, including plaintiffs age, which at the time was 72, he would recommend the least invasive procedure, which was the laminectomy recommended by Dr. Mody. This was Dr. Goodman’s last time to see Mr. Fuller. .
[7Mr. Fuller continued to treat with his general practitioner, Dr. Bernard, and internist, Dr. Sally Ball, for his diabetes, high blood pressure and thyroid disease. On May 12, 2014, plaintiff complained to Dr. Bernard of lower back pain and requested an MRI. Dr. Bernard referred Mr. Fuller to Dr. Jorge Martinez, a neurosurgeon.
Dr. Martinez saw plaintiff on June 2, 2014, and obtained a detailed medical his-toryTrom him. After examining Mr. Fuller and reviewing results from an MRI Dr. Martinez ordered,-it was his impression that plaintiff suffered from significant degenerative lumbar disc disease and lumbar spondylosis which predated the accident and was not uncommon for a 72-year, old. When asked to -qompare prior MRI results with the one he ordered, Dr. Martinez observed a progression in Mr. Fuller’s degenerative condition. On direct exam, Dr. Martinez described plaintiffs condition as a. chronic one that had been going on for years, one that could be asymptomatic but sooner or later, would require surgery.
Dr. Martinez recommended that Mr. Fuller undergo a lumbar fusion with instrumentation at three separate levels. Plaintiff had surgery on June 25, 2014. He returned to Dr. Martinez for his first post-surgery visit on July 9, 2014. Mr. Fuller denied any significant back.or leg pain and stated that he was able to walk longer distances. At two weeks post-operative, Dr. Martinez considered that to be a “pretty good recovery.” The next appointment was on September 24,2014. Plaintiff complained of some generalized, mild soreness at the surgical site and told Dr. Martinez he Iscould walk a mile. One month before trial, on. January 16, 2015, Mr. Fuller had a follow-up appointment. Dr. Martinez noted that:
The patient is doing remarkably well. He denied any back pain, any paresthe-sia or weakness. He only complained of . mild soreness in morning when he gets up. Otherwise, the patient is doing- remarkably well. The patient is taking Neuron ten three times a day. Not any more paresthesia in lower extremities.
Dr. Martinez stated that in his recent follow-up appointments with Mr. Fuller, he had not seen any decline in his recovery or return of any low back pain symptoms, and he expected plaintiff to return to .normal *250 within one year of surgery. While Dr. Martinez considered the surgery to be a •success, it did not return- Mr. Fuller to his pre-accident physical condition.
Dr. Goodman reviewed Mr. Fuller’s medical records after the surgery." According to Dr. Goodman, at that time, his diagnosis and opinion remained the same; Mr. Fuller should have undergone the minimally invasive laminectomy recommended by Dr. ■ Mody rather than the three-level lumbar fusion with instrumentation performed by Dr. Martinez. Nonetheless, Dr. Goodman conceded that since Dr. Martinez was Mr. Fuller’s treating specialist, he was in the best position to determine whether or not plaintiff needed the fusion surgery.

Testimony of Mr. Lawrence and Family

■ ■ McLawrence Fuller, his wife and two of his children testified at trial regarding his limitations after the accident. At the time of the accident, plaintiff had been retired from his construction business for several years, but continued to do some carpentry, framing and electrical work from time to time. He was a member of the school board, had six grown children and |3a “lot” of grandchildren. Mr. Fuller was active, enjoying activities such as bowling, tossing washers, traveling with his wife and family, gardening, mowing his own yard (which was several acres), and playing with and picking up his grandchildren. Mr. Fuller was in good physical shape, as far as he knew, for a 70-year-old man. He had no sleep problems or disturbances. He was under a doctor’s care for diabetes, high blood pressure, and thyroid disease, but had no chronic pain problems or conditions, just minor aches and pains from time to time.
After the accident, he retired from the school board because he had trouble hearing and to spend more time with his wife. However, Mr. Fuller has some level of pain every day after the wreck, even after he had surgery. Mr. Fuller no longer bowls as frequently as before, as he has difficulty doing so, and his travel has been limited because of pain. Daily activities such as dressing himself and walking have become uncomfortable and painful. He can no longer play actively with his grandchildren.
Plaintiff has suffered from pain from the time of the accident through the date of trial. Mr. Fuller had prior back and neck pain which he had received treatment for pre-accident and “lapses” in his treatment for lower back pain post-accident. Plaintiffs general practitioner categorized the pre-accident back/neck complaints as nothing major or ongoing and the record shows that after his accident, plaintiff chose conservative or no treatment for periods of time because once he got the recommendation for surgery in 2012, he declined due to the potential risks involved, which hit close to home for him, considering his sister’s extreme bad response to anesthesia | induring her own back surgery as well as a friend’s similar experience. Also, Mr. Fuller wanted to try to manage on his own as long as he could before having surgery.

Discussion

JNOV

The use of JNOV is provided for by La. C.C.P. art. 1811. A motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues. La. C.C.P. art. 1811(F); Smith v. State, Dept. of Transportation & Development, 04-1317 (La.03/11/05), 899 So.2d 516. While article 1811 does not specify the grounds upon which the trial judge may grant a JNOV, the Louisiana Supreme Court has set forth the criteria as follows: •
*251 A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly • in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in'the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00), 772 So.2d 94, 99 (internal citations omitted). See also VaSalle v. Wal-Mart Stores, Inc., 01-0462 (La.11/28/01), 801 So.2d 331.
The rigorous standard of JNOV is based upon the principle that when there is a jury, the jury is the trier of fact. Smith, supra-, Joseph, supra. In previewing a JNOV, an appellate court must initially determine whether the trial judge erred in granting the JNOV by using the above-mentioned criteria in the same way as the trial judge in deciding whether to grant the motion. Id.; Trunk v. Medical Center of Louisiana at New Orleans, 04-0181 (La.10/19/04), 885 So.2d 534; VaSalle, supra. In other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not reach different conclusions. Smith, supra; VaSalle, supra; Fanguy v. Patwardhan, 48,773 (La.App.2d Cir.04/09/14), 136 So.3d 998.
If there is evidence opposed to the motion for JNOV which is of such quality and weight that reasonable and fairminded men, in the exercise of impartial judgment, might reach different conclusions, the motion' should be denied. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991); Fanguy, supra. Simply stated, a trial court can grant a JNOV only when a jury’s verdict is one which reasonable people could not have rendered; if reasonable people could have' arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Id.

General Damages

In this case, the trial judge granted a JNOV on the issue of general damages because he found that “the general damage award [in the amount of $155,000] to be woefully inadequate in light of plaintiff s injuries and the effect they had on his life.” Plaintiff agrees with the trial judge’s |12assessment, but defendants assert that the jury’s award was reasonable in light of the evidence presented.
In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion is left to the judge or jury. La. C.G. art. 2324.1. General damages are intended to compensate an injured plaintiff for mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00), 773 So.2d 670; Caldwell v. ANPAC Insurance Co., 50,333 (La.App.2d Cir.01/13/16), 185 So.3d 846; Brown v. City of Monroe, 48,764 (La.App.2d Cir.02/26/14), 135 So.3d 792.
*252 The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. LeBlanc v. Stevenson, 00-0157 (La.10/17/00), 770 So.2d 766; Young v. Marsh, 49,496 (La.App.2d Cir.11/19/14), 153 So.3d 1245. The nature, relative severity, and extent of bodily injuries are qualitative factors that must first be considered by the trier of fact in awarding general damages. The duration, of a plaintiffs injury symptoms and the duration of treatment are quantitative factors that must also be taken into account. Young, supra. Since the jury is-in the best position to evaluate witness credibility and see the evidence firsthand, it is afforded much discretion in independently assessing the facts and rendering an award. Miller v. LAMMICO, 07-1352 (La.01/16/08), 973 So.2d 693.
|1SA11 reasonable inferences from the evidence are to be construed in the light most favorable to the party not moving for JNOV. Trunk, supra-, Joseph, supra. There was evidence presented from which the jury could have concluded that some of the'activities Mr. Fuller could no longer fully enjoy and other limitations on Mr. Fuller post-accident were not curtailed or caused solely by the accident, but by age or a combination of the aging process and his pre-existing disc disease and spinal stenosis. There was also testimony by plaintiffs treating surgeon that while Mr, Fuller had some residual pain, he had improved significantly' following his surgery. In light of the testimony and evidence presented, the jury could have found that.a general damage award of $155,000 was fair and adequate compensation for plaintiff, particularly considering that the jury did not make a blanket award, but instead separated their ■ general damage award into separate amounts for physical and mental pain, suffering and anguish ($50,000), past enjoyment of life ($75,000) and future loss of enjoyment of life ($30,-000).

Future Medical Expenses

The trial judge declined to make an award of future medical expenses in its grant of JNOV. Defendants urge that this ruling was correct as the record failed to support such an award, and plaintiff urges that the failure to award him future medical expenses constitutes error. However, as determined by the jury (and the trial court in its JNOV ruling), we can find no support for such an award in the record.
The recovery of future medical expenses is dependent upon the tort victim establishing the probability of the future medical expenses with 114supporting medical testimony and estimations of their probable cost. Menard v. Lafayette Insurance Co., 09-1869 (La.03/16/10), 31 So.3d 996; Young, supra. Future medical expenses must be established with some degree of certainty. Id. The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that the'future medical expense will be medically necessary. Menard, supra.
Plaintiff failed to show that future medical expenses would be incurred, and what their estimated cost would be, The only evidence.suggesting such an expense was plaintiffs testimony that he had an upcoming appointment with' Dr.. Martinez, his neurosurgeon, in May 2015. This does not rise to the level of proof required to establish an award of future medical expenses, and. neither the jury nor the trial judge erred in failing to make such an award.
For the reasons set forth above, we find that the jury’s verdict was reasonably supported by .the evidence presented in this case, • and that the trial judge erred in granting plaintiffs motion for JNOV on *253 the issue of damages. We therefore reverse the trial judge’s JNOV and reinstate the jury’s verdict. '■

Conclusion

Reversed; Verdict Reinstated. Costs of this appeal áre assessed to plaintiff-appellant, McLawrence Fuller. REVERSED; VERDICT REINSTATED.

. At trial, Dr. Bernard testified that báck pain was "a very prominent complaint” of Mr. Fuller's prior to the accident. However,. Dr. Bernard stated that his records document that these complaints of back or neck pain were not major or frequent. Plaintiff also had complaints of right hip and leg pain prior to the September 2010 accident. At that time, Dr. Bernard referred Mr.- Fuller to an orthopedic specialist, Dr. Gordon Mead. An X-ray ordered by Dr. Mead showed mild arthritis in plaintiff’s knee. In reviewing Mr. Fuller’s records, including notes showing consultation and treatments with several other specialists, Dr. Bernard testified that plaintiff’s prior back compláints could have been related to his degenerative disc disease and stated that he would defer to Dr. Martinez, Mr. Fuller’s neurosurgeon, as to whether the September 2010 accident triggered or caused plaintiff’s degenerative disc disease to become symptomatic and require surgical intervention.

. They also discussed the possibility of fusion but Dr. Mody did not consider that surgery to be in Mr. Fuller’s best interest, because he showed no instability or abnormal motion and had no fractures. Dr. Mody recommended a laminectomy over fusion because of plaintiff's complaints and MRI results. ,